UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Beales, Chafin and Senior Judge Coleman
Argued at Richmond, Virginia


CHARLES J. DELANOY

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2457-13-2                      JUDGE RANDOLPH A. BEALES
                                                    DECEMBER 30, 2014
ROBIN R. DELANOY


                FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
                            Cheryl V. Higgins, Judge

            Christopher J. Smith (Law Offices of Christopher J. Smith, PC, on
            briefs), for appellant.

            David B. Franzen (Seth J. Ragosta; Lenhart Pettit PC, on brief), for
            appellee.


        Charles J. DeLanoy (husband) appeals the circuit court's order granting Robin R. DeLanoy

(wife) a divorce on the ground that the parties had lived separate and apart for more than one year.

Husband raises nine assignments of error pertaining to the issues of post-separation adultery,

equitable distribution, and spousal support.  Wife, in her responsive brief, has raised eight

assignments of cross-error pertaining to the issues of constructive desertion and equitable

distribution.  For the reasons explained below, we affirm in part, reverse in part, and remand the

matter to the circuit court for further proceedings consistent with this opinion.


---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

When, as here, a circuit court hears the evidence at an *ore tenus* hearing, "'its factual findings are entitled to great weight'" on appeal. Mayer v. Corso-Mayer, 62 Va. App. 713, 728, 753 S.E.2d 263, 270 (2014) (quoting Mullin v. Mullin, 45 Va. App. 289, 299-300, 610 S.E.2d 331, 336 (2005)). The circuit court "'ascertains a witness' credibility, determines the weight to be given to their testimony, and has discretion to accept or reject any of the witness' testimony.'" Layman v. Layman, 62 Va. App. 134, 137, 742 S.E.2d 890, 891 (2013) (quoting Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668 (1997)).

The case comes to this Court with a voluminous record of the circuit court proceedings. The parties have provided this Court with a fourteen-volume joint appendix that spans nearly 7,000 pages. "Therefore, for the sake of both brevity and clarity, we will discuss the facts pertinent to resolving the various issues in this case as they are relevant to the analysis of the respective issues on appeal. However, there are a few facts and procedural points to note initially by way of background." Fadness v. Fadness, 52 Va. App. 833, 839, 667 S.E.2d 857, 860 (2008).

Husband and wife married in 1992. In its December 14, 2012 letter opinion, the circuit court discussed the circumstances leading to the parties' separation, commenting that wife and husband seemed to agree that the marriage was generally harmonious until about 2003. The circuit court found that it was undisputed that the parties had agreed that wife "would stay home while the

---

[1] Under settled principles, "we view the evidence in the light most favorable to the prevailing party in the trial court, granting to that party the benefit of any reasonable inferences." Wright v. Wright, 61 Va. App. 432, 442 n.2, 737 S.E.2d 519, 523 n.2 (2013). Therefore, the evidence related to the issues raised in husband's assignments of error must be viewed in the light most favorable to wife, as the prevailing party below – and the evidence related to the issues raised in wife's assignments of cross-error must be viewed in the light most favorable to husband, as the prevailing party below. Id.

children were young[2] and take care of the family and the household and [husband] would be the one to go to work." The circuit court found that husband, a certified public accountant (CPA) with Klockner Pentaplast, supported the family financially during the marriage – whereas wife contributed mostly in non-monetary ways during the marriage. The circuit court found that the parties' contributions to the well-being of the family were essentially equal. Wife did return to school in 2005 to pursue a degree in nursing, and she was working full-time as a nurse at a correctional facility at the time of the parties' divorce trial. The circuit court noted husband's disagreement with wife's decision to attend James Madison University (an hour away from the marital home) to pursue the nursing degree,[3] indicating that this disagreement was one of several circumstances that led to the breakdown of the parties' marriage. Husband argued in the circuit court that the parties had separated by May 2006. The circuit court found that the parties continued to attend counseling and attempted to resolve their differences after that date. The circuit court instead found that the parties had actually separated in August 2009, at which time both parties still resided in the marital home but in different bedrooms.

---

[2] The parties' two children were born in March 1997 and January 2000. While the circuit court did not order any *pendente lite* child support, the circuit court subsequently directed husband in the July 17, 2013 order of divorce to pay wife $1,103 in monthly child support. The parties have not raised any issues pertaining to child custody and visitation or child support in this appeal.

[3] Husband testified that he believed that it would be more beneficial to the family if wife had attended the University of Virginia (which, according to husband's testimony, had a strong relationship with husband's employer) or the local community college. Wife testified that she felt that James Madison University's nursing program was better suited to students, such as her, who return to college later in life. The circuit court apparently found wife's testimony credible here, finding in the December 14, 2012 letter opinion, "One of the reasons why the Court thinks the issue of where Ms. Delanoy would attend nursing school was so significant was because she did sincerely seem to be looking for the school where she would be most likely to succeed so she could obtain employment as a nurse." The circuit court also found from the bench on February 19, 2013 that wife was "intimidated by the idea" of "competing with UVA students as her classmates" and that wife did not appear to be "completely contrary" on this issue or that she chose James Madison University "simply because it was the farthest away."

On October 15, 2010, wife filed a divorce complaint in the circuit court. Husband filed his answer on November 12, 2010. Both parties raised statutory fault grounds in their pleadings.[4] The circuit court held a *pendente lite* hearing on March 5, 2011 and subsequently entered a *pendente lite* order on October 20, 2011. The parties' five-day divorce trial occurred in the circuit court from May 21, 2012 through May 24, 2012 and again on June 19, 2012.

On December 14, 2012, the circuit court issued its letter opinion in which it decided most of the issues that are pertinent to this appeal. In the letter opinion, the circuit court found that neither party had satisfied the burden of proving that the other party had committed a fault ground for divorce. The circuit court also classified and divided the parties' marital assets for equitable distribution purposes. In addition, the circuit court awarded wife a $300,000 lump sum spousal support award, directing husband to pay this award within sixty days.[5]

At hearings held on December 17, 2012 and February 19, 2013, the circuit court made further findings from the bench that confirmed many of the pertinent rulings from the letter opinion. The circuit court thereafter entered several additional orders – including a March 28, 2013 order granting husband possession of the marital residence on the condition that husband pay wife $110,572.36 (representing half of the marital equity in that residence). The circuit court then entered its order of divorce on July 17, 2013, and it entered its final order in this matter on December 6, 2013.

---

[4] Husband's pleadings did not initially raise an allegation of adultery. The circuit court issued a bench ruling permitting husband to amend his counter-claim to allege the fault ground of adultery and permitted husband to present evidence relating to both men with whom husband has alleged that wife committed post-separation adultery. Wife has not assigned error to the circuit court's ruling here.

[5] The circuit court's July 17, 2013 order of divorce stated that, in the event husband appealed the $300,000 lump sum spousal support award, he was directed to pay wife $3,000 in monthly spousal support during the pendency of the appeal.

II. ANALYSIS

A. FAULT GROUNDS[6]

1. POST-SEPARATION ADULTERY (HUSBAND'S ASSIGNMENTS OF ERROR 1 AND 6)

In his first assignment of error, husband argues that the circuit court erred in its conclusion that the evidence failed to establish that wife committed post-separation adultery. See Derby v. Derby, 8 Va. App. 19, 24, 378 S.E.2d 74, 76 (1989) (explaining that the divorce fault ground of adultery can be established through a party's post-separation adultery). This issue also has a significant effect on husband's sixth assignment of error, in which he challenges the $300,000 lump sum spousal support award that was granted to wife. Given his claim that wife committed adultery, husband contends that wife should be barred from receiving any spousal support under Code § 20-107.1(B).[7]

"'One who alleges adultery has the burden of proving it by clear and convincing evidence.'" Hughes v. Hughes, 33 Va. App. 141, 146, 531 S.E.2d 645, 647 (2000) (quoting Seemann v. Seemann, 233 Va. 290, 293, 355 S.E.2d 884, 886 (1987)); see also Derby, 8 Va. App. at 24, 378 S.E.2d at 76 ("To prove adultery, the evidence of extramarital sexual intercourse must be clear and

---

[6] Code § 20-91(A) states, in pertinent part, that a "divorce from the bond of matrimony may be decreed" for "adultery" or where one party "has been guilty of cruelty, caused reasonable apprehension of bodily hurt, or willfully deserted or abandoned the other" party. The circuit court may also enter a divorce, irrespective of fault, "when the husband and wife have lived separate and apart without any cohabitation and without interruption for one year." Code § 20-91(A)(9)(a). When the evidence supports both a fault ground for divorce and a divorce without fault, the circuit court has the discretion to enter the divorce either on the basis of the fault ground or on the basis of the parties having lived separate and apart for the required period of time. See, e.g., Lassen v. Lassen, 8 Va. App. 502, 505, 383 S.E.2d 471, 473 (1989). Nevertheless, the issue of whether fault has been proven still has substantial bearing on the right of a party to receive spousal support and on the equitable division of marital assets. See Code §§ 20-107.1(B) and 20-107.3(E)(5).

[7] That statute states that, when a circuit court finds sufficient evidence that a party has committed a fault ground for divorce under Code § 20-91(1) (such as adultery), the circuit court may not order spousal support for the offending party unless "the court determines from clear and convincing evidence, that a denial of support and maintenance would constitute a manifest injustice, based upon the respective degrees of fault during the marriage and the relative economic circumstances of the parties." Code § 20-107.1(B).

convincing."). According to the Supreme Court's decision in Seemann, "clear and convincing" evidence is:

> that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

233 Va. at 293 n.1, 355 S.E.2d at 886 n.1; see also Dooley v. Dooley, 222 Va. 240, 246, 278 S.E.2d 865, 868 (1981) (explaining that "the judicial mind must be convinced" that adultery occurred in order for that fault ground to apply (internal quotation marks and citations omitted)); Painter v. Painter, 215 Va. 418, 420, 211 S.E.2d 37, 38 (1975) (explaining that the clear and convincing standard is satisfied when there is "clear, positive, and convincing" evidence of adultery).

On appeal, a circuit court's finding of whether adultery has been proven by clear and convincing evidence will not be disturbed unless that finding was plainly wrong or without evidence to support it. See Seemann, 233 Va. at 294, 355 S.E.2d at 887; see also School Board of Campbell County v. Beasley, 238 Va. 44, 51, 380 S.E.2d 884, 888 (1989) ("When a case is decided by a trial court sitting without a jury, the judgment below 'shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.'" (quoting Code § 8.01-680)). Under this very deferential standard of review, as the Supreme Court has stated, "The appellate court is not permitted to reweigh the evidence or to substitute its factual judgment for that of the circuit court." Beasley, 238 Va. at 51, 380 S.E.2d at 888; see also Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007).

Here, husband argues that the evidence proved that wife committed post-separation adultery with James Rouse, Michael Lipton, or both. On brief, husband focuses far more attention on the adultery allegation with respect to Lipton. While the evidence suggesting post-separation adultery

with Rouse is not particularly compelling,[8] the issue of whether wife committed post-separation adultery with Lipton is more complex and requires a more thorough analysis on appeal. See Painter, 215 Va. at 420, 211 S.E.2d at 38 (stating that "[c]are and circumspection should accompany consideration of the evidence" when adultery is alleged).

Unlike Rouse, who denied any romantic feelings for wife, Lipton was wife's boyfriend at the time of the trial in May and June 2012 – and Lipton remained in that relationship with wife at all pertinent times after the June 2012 hearing concluded. The record establishes that wife and Lipton met through an online dating website in June 2011 – and that they were dating by December 2011. Wife and Lipton went on out-of-state vacations together to North Carolina and Michigan in the early part of 2012. They both acknowledged at trial that they had slept in the same bed during those trips. Wife and Lipton both denied that any sexual acts occurred between the two of them,[9] while also maintaining that they remained clothed when they slept together. Lipton did acknowledge

---

[8] The record establishes that wife met Rouse, a firefighter, as part of a bachelor auction that wife was coordinating. Wife and Rouse both testified at the parties' divorce trial in May 2012. Taking this testimony in the light most favorable to wife, as we must since she prevailed below, wife and Rouse kissed each other once on the cheek as a "goodbye" gesture and subsequently went on a shopping excursion from Charlottesville to Richmond. On another occasion, Rouse spent one night at wife's house (i.e., the marital residence, before the residence was transferred to husband). Wife and Rouse both denied that they ever had romantic feelings for each other and claimed that they did not engage in any sexual activity that night (or at any other time), maintaining that Rouse stayed at wife's house because he did not want to drive home while he was potentially intoxicated and that he actually slept in the guest room that night. In its December 14, 2012 letter opinion, the circuit court noted that, while there was a "great disparity" between wife's testimony and Rouse's testimony about some of the details of that night, it "still found Mr. Rouse's testimony credible that they did not have a sexual relationship." On appeal, we defer to the circuit court's credibility determination here. See Street, 25 Va. App. at 387, 488 S.E.2d at 668.

[9] Lipton, in particular, was questioned extensively on this subject by husband's counsel. Lipton denied that any "genital touching" occurred, denied that any "oral sex or fellatio or cunnilingus" occurred, and denied that any "sexual intercourse" occurred. Lipton also testified that he had never seen wife naked and that wife had never seen him naked. Lipton did acknowledge touching wife's breasts through her clothing "[m]aybe a little bit."

some contact of an intimate nature, adding that he and wife would kiss passionately while in bed together.

In addition, wife and Lipton also testified that they had spent the night together in the same bed on multiple occasions at each other's homes – both at wife's residence in Charlottesville and at Lipton's residence in the Richmond area. At trial, wife testified that she could not even remember how many times Lipton had stayed at her house (although it was always when the parties' children were with husband) or how many times she had stayed at Lipton's house. She also denied even knowing Lipton's address, stating that the address was stored in her phone and that she relied on her car's GPS device for directions to his house. Wife testified that Lipton had stayed at her house in Charlottesville more times than she had stayed at Lipton's house in Richmond. Lipton's testimony actually conflicted with wife's testimony on this point – as Lipton estimated that he had spent perhaps more than five nights at wife's house and that wife had probably stayed twice as many nights at his house. Wife and Lipton testified that they intended to continue dating and that they purchased gifts for each other, although both denied plans to get married or to live together. Lipton's presence in wife's life continued to increase following the divorce trial – to the extent that the circuit court held a December 17, 2012 hearing on husband's motion to limit Lipton's presence during visitation exchanges of the parties' children.[10]

The Supreme Court stated in Higgins v. Higgins, 205 Va. 324, 136 S.E.2d 793 (1964), that "[c]ommon sense" and "common experience" must be "used as our guide" in assessing an allegation of adultery. Id. at 328, 136 S.E.2d at 796 (internal quotation marks, alterations, and citation omitted). An allegation of adultery in a divorce case does not require proof beyond a reasonable doubt, and, therefore, a finding of adultery certainly does not require unequivocal proof

---

[10] The circuit court later entered a written order barring Lipton from having any contact with husband during the visitation exchanges – directing Lipton to remain inside the house for visitation exchanges occurring at wife's residence and permitting Lipton only to "remain in a car in the immediate vicinity of the exchange location" for visitation exchanges occurring elsewhere.

of adultery, such as a party admission of adultery or documentary evidence of adulterous conduct. See Seemann, 233 Va. at 293 n.1, 355 S.E.2d at 886 n.1 (explaining that "clear and convincing" does not mean "clear and unequivocal"). Applying the clear and convincing standard of proof, a rational factfinder could make a finding of adultery where the following circumstances exist – a spouse and the alleged paramour are engaged in an exclusive and extended dating relationship, they travel together on vacation, they spend the night at each other's house more times than both can remember, and they routinely sleep in the same bed while staying together. However, the circuit court *in this particular case* (uniquely acting as the factfinder here) found that the allegation of post-separation adultery between wife and Lipton had not been proven by clear and convincing evidence. Therefore, our analysis is not whether *a* factfinder could find sufficient evidence of adultery – but whether the conclusion reached by the specific factfinder in this case was plainly wrong or without evidence to support it. See Code § 8.01-680.

Here, the circuit court found that wife and Lipton provided credible testimony that explained the nature of their relationship and that amounted to more than a bare denial of adultery. In fact, the circuit court based its findings on specific credibility determinations. "[I]n determining whether clear and convincing evidence supports a finding of adultery, the Supreme Court and this Court have consistently reviewed the record to determine not only whether the evidence merely established suspicious conduct, but also whether a credible explanation existed for the circumstances." Hughes, 33 Va. App. at 150, 531 S.E.2d at 649; see also, e.g., Coe v. Coe, 225 Va. 616, 303 S.E.2d 923 (1983) (where the spouse made "no attempt to explain her relationship with [the paramour], or her presence in his unlighted apartment on the two occasions testified to by the detective"); Gamer v. Gamer, 16 Va. App. 335, 340, 429 S.E.2d 618, 642 (1993) ("Overwhelming evidence was introduced of [the husband's] extramarital affair, and the only evidence to the contrary was his less than credible bare denial.").

At the divorce trial, wife gave the following responses to questions from her attorney:

> Q: Why have you slept in the same bed with Mr. Lipton?
>
> A: Well, we were separated for quite some time. And I think we were both lonely, and I just wanted to be close. And we care about each other. *But knowing that having sex is not part – a part of that, I didn't want to go there until marriage and it's not even at that point or marriage thinking. And it was just mainly for closeness.*
>
> Q: And do you hold one another?
>
> A: Yes.
>
> Q: Did you have sexual, intimate sexual contact?
>
> A: No.

(Emphasis added). Similarly, Lipton denied any sexual involvement with wife, testifying:

> What she has – we've had very limited discussion about it, and *as long as she's married, she would prefer to keep our dating relationship as a very simple one without the sexual aspects.*

(Emphasis added).

Acting as factfinder, the circuit court had the choice to accept the explanations provided by wife and by Lipton – or, instead, to reject that testimony. The circuit court, in its discretion, chose to accept their testimony as credible. Reflecting on this testimony pertaining to the nature of wife's relationship with Lipton, the circuit court made the following findings from the bench at a post-trial hearing on February 19, 2013:

> I further found that wife did – had not committed adultery with Mr. Lipton. *I found their testimony credible that while they admittedly slept together in the same bed and engaged in romantic physical displays of affection that they were not involved in sexual intercourse*.
>
> \*   \*   \*   \*   \*   \*   \*
>
> If I recall correctly, when Ms. DeLanoy was testifying as to this issue, she explained that the displays of affection and a romance were because she was, in part, lonely. And I find that she was

emotionally lonely. But I don't find that that leads to the conclusion that as part of the feeling of lonely – this emotional loneliness that she committed sexual intercourse. I don't find that the two of those are correlated. *And nor did I find Ms. DeLanoy's behavior overall just to be a bare denial.* . . . I think, to a certain extent, she felt unattractive and that what [Mr. Lipton] offered her . . . is attention, and that attention filled the need.

(Emphasis added).

Under the very deferential standard of review that governs this issue, we must defer to the circuit court's credibility findings here because they were not plainly wrong or unsupported by evidence in the record. See Richardson v. Richardson, 242 Va. 242, 246, 409 S.E.2d 148, 151 (1991) (discussing the deference given to the factfinder who presides at an *ore tenus* hearing); see also Sutherland v. Sutherland, 14 Va. App. 42, 44, 414 S.E.2d 617, 618 (1992) ("[T]he decision of the trial judge is peculiarly entitled to respect for [that judge] saw the parties, heard the witnesses testify and was in closer touch with the situation than the [appellate] Court, which is limited to a review of the written record."). Here, the circuit court had the opportunity to see and hear the testimony of the witnesses – which we, of course, cannot now do on appeal, since this Court "reviews only a cold record." Harris v. Woodrum, 3 Va. App. 428, 433, 350 S.E.2d 667, 670 (1986); see also Bradley v. Commonwealth, 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955) ("The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them."). Given the circuit court's ability to view the witnesses and to assess their credibility, this Court now on appeal "may not retry the facts or substitute our view of the facts for those of the [circuit] court."[11] Calvin v. Calvin, 31 Va. App. 181, 183, 522 S.E.2d 376, 377

---

[11] Husband notes that the Supreme Court reversed a credibility determination in Higgins and that this Court likewise rejected a credibility determination in Gamer – and that both of those cases were appeals from findings that adultery had not been proven by clear and convincing evidence. However, Higgins and Gamer are distinguishable from this case – given that the testimony in both of those cases was presented to a commissioner in chancery, who then

(1999); see also, e.g. Nusbaum, 273 Va. at 408, 641 S.E.2d at 507; Beasley, 238 Va. at 51, 380 S.E.2d at 888; Mullin, 45 Va. App. at 299-300, 610 S.E.2d at 336.

Therefore, viewing the circumstances here in the light most favorable to wife (as we must, since wife prevailed on this issue below), we must defer to the circuit court's view of the evidence based on its specifically stated assessment of the credibility of the witnesses. See Beasley, 238 Va. at 51, 380 S.E.2d at 888. In light of the circuit court's credibility findings, we must affirm the circuit court's conclusion that adultery had not been proven by clear and convincing evidence.[12] Consequently, we must also disagree with husband's argument that wife should be barred from receiving any spousal support based on his allegation that wife engaged in post-separation adultery. See Code § 20-107.1(B).

### 2. CRUELTY/CONSTRUCTIVE DESERTION (WIFE'S ASSIGNMENT OF ERROR 1)

In her first assignment of error, wife argues that the circuit court erred by failing to find that husband was at fault by constructively deserting the marriage through alleged cruelty toward wife. See Code § 20-91(6). Wife argues that the circuit court should have found that husband was at fault and should have considered husband's alleged fault when it addressed the equitable distribution of the marital assets. See Code § 20-107.3(E)(5) (directing the trial court to consider, *inter alia*, "[t]he circumstances and factors which contributed to the dissolution of the marriage, specifically

---

prepared a report and recommendation for the actual factfinder in those cases. See Higgins, 205 Va. at 328-29, 136 S.E.2d at 796; Gamer, 16 Va. App. at 339-41, 429 S.E.2d at 621-22. Accordingly, as the Supreme Court noted in Higgins, the Supreme Court viewed the same "cold print of the record" that the factfinder had considered in that case. Higgins, 205 Va. at 328, 136 S.E.2d at 796; see also Seemann, 233 Va. at 293, 355 S.E.2d at 886 (explaining that "a commissioner's report is not entitled to the weight given to" a jury or bench verdict). Unlike in Higgins and Gamer, it was the circuit court judge here who actually viewed all of the live testimony that was delivered at the *ore tenus* hearing in this case – and who made credibility findings on that basis in its role as the factfinder.

[12] Given the nature of our decision here, we also conclude that the circuit court did not commit reversible error when it declined to admit further evidence compiled by husband's private investigator establishing that wife and Lipton continued to spend the night together after the parties' divorce trial had concluded and after the evidence in this case had closed.

including any ground for divorce under the provisions of subdivisions (1), (3) or (6) of § 20-91 or § 20-95").

> [D]esertion as a ground of divorce does not depend on who actually leaves the family home. It means desertion of the marital relationship. Desertion may be "constructive," for cruelty by one party, which results in the other party's enforced separation, is tantamount to desertion by the party performing the cruel acts. Hoffecker v. Hoffecker, 200 Va. 119, 125-26, 104 S.E.2d 771, 776 (1958); Elder v. Elder, 139 Va. 19, 26, 123 S.E. 369, 371 (1924).

Zinkhan v. Zinkhan, 2 Va. App. 200, 208, 342 S.E.2d 658, 662 (1986).

> "But it is obvious that what merely wounds the feelings without being accompanied by bodily injury or actual menace – mere austerity of temper, petulance of manner, rudeness of language, want of civil attention and accommodation, or even occasional sallies of passion that do not threaten bodily harm, although they be high offenses against morality in the married state, does not amount to legal cruelty."

Id. at 208, 343 S.E.2d at 662-63 (quoting Latham v. Latham, 71 Va. (30 Gratt.) 307, 320-22 (1878)).

Assuming without deciding that wife has adequately preserved this assignment of error,[13] the fault ground of cruelty or constructive desertion simply was not proven here. As the circuit court found in its December 14, 2012 letter opinion, "[T]here were actions on the part of both parties consisting of angry words, annoyances, and failure to maintain the marital relationship but the Court does not find that that is sufficient to show cruelty." The circuit court's assessment of the circumstances here was supported by evidence in the record on appeal, and, therefore, this Court

---

[13] In its December 14, 2012 letter opinion, the circuit court did not expressly address wife's allegation that husband had engaged in cruelty. Instead, the letter opinion focused on (and rejected) *husband's* allegation that "wife engaged in mental abuse and cruelty as required by the law" – although the circuit court also addressed the actions of *both* parties in general when it conducted this analysis. In her objections to the final order of divorce, wife simply alleged, "[Husband] should have been found at fault for his coldness and withdrawal from the marriage, and the [wife] should have been awarded a higher percentage of the value of the marital property due to his fault." We will assume without deciding that this objection broadly encompassed the issue of constructive desertion – especially since wife alleged the fault ground of cruelty or constructive desertion in her divorce complaint that was filed in the circuit court.

- 13 -

will not disturb the circuit court's finding here. See Code § 8.01-680. While the record establishes that the parties' marriage did not remain harmonious, the record certainly does not prove that husband's alleged misconduct met the standard for the cruelty fault ground – i.e., conduct that is "very serious and such as amount[ing] to extreme cruelty, entirely subversive of the family relations rendering the association intolerable." Zinkham, 2 Va. App. at 209, 343 S.E.2d at 663.

### B. EQUITABLE DISTRIBUTION

"'In reviewing an equitable distribution award on appeal, we have recognized that the trial court's job is a difficult one, and we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case.'" Wright v. Wright, 61 Va. App. 432, 449-50, 737 S.E.2d 519, 527 (2013) (quoting Klein v. Klein, 11 Va. App. 155, 161, 396 S.E.2d 866, 870 (1990)); see also Srinivasan v. Srinivasan, 10 Va. App. 728, 732, 396 S.E.2d 675, 678 (1990) (explaining that "[f]ashioning an equitable distribution award lies within the sound discretion of the trial judge"). Accordingly, this Court will not reverse an award "[u]nless it appears from the record that the [trial court] has abused [its] discretion," that the trial court "has not considered or misapplied one of the statutory mandates," or "that the evidence fails to support the findings of fact underlying [the] resolution of the conflict." Smoot v. Smoot, 233 Va. 435, 443, 357 S.E.2d 728, 732 (1987).

### 1. SUNTRUST ACCOUNT 5678 (HUSBAND'S ASSIGNMENT OF ERROR 2)

In his second assignment of error, husband challenges the circuit court's monetary award of $77,100.21 to wife – which the circuit court found to represent the "current value" of SunTrust account 5678 at the time of the circuit court's December 14, 2012 letter opinion. Husband argues that the circuit court erred in determining the value of this account.

"As '[t]he value of property is an issue of fact, not of law,' Howell v. Howell, 31 Va. App. 332, 340, 523 S.E.2d 514, 518 (2000), we are bound by [the circuit court's] finding on appeal,

unless it is plainly wrong or without evidence to support it, Smith v. Board of Supervisors, 201 Va. 87, 91, 109 S.E.2d 501, 505 (1959)." Patel v. Patel, 61 Va. App. 714, 722, 740 S.E.2d 35, 39 (2013).

The record establishes that the parties opened many different accounts with SunTrust Bank. In 2007 and 2008, a total of approximately $1,000,000 in proceeds from the sale of stock in Klockner Pentaplast (husband's employer) was deposited in SunTrust account 8082, a checking account. These proceeds eventually found their way to SunTrust account 4959, a money market account. In May 2010, wife opened SunTrust account 7053 in her own name, transferring $300,000 of the funds from account 4959 to account 7053. In response, husband transferred about $687,000 from SunTrust account 4959 (depleting that account) and placed those funds in SunTrust account 0532 – an account that husband opened in his name. Husband then transferred about $417,000 from SunTrust account 0532 to SunTrust account 5678 – the subject of this assignment of error – paying marital and family expenses from account 5678 during the pendency of the divorce litigation.

In its December 14, 2012 letter opinion, the circuit court found:

> SunTrust #5678 is marital and has a current value of $77,100.21. As of the date of the [May 2012 equitable distribution] hearing, the value was $200,175.00 and the Court will use the date of the hearing as the valuation date and order this account to Ms. Delanoy with no offset to Mr. Delanoy.

In the July 17, 2013 order of divorce, the circuit court ruled, "Sun Trust account XXX5678 is marital, and has a value of $77,100.21. The funds in this account are allocated to wife at $77,100.21 with no offset to husband."

Thus, it appeared that the circuit court originally intended to value SunTrust account 5678 as of the time of the equitable distribution portion of the divorce trial in May 2012, finding that it had a

value of $200,175 at the time of that hearing.  See Code § 20-107.3(A).[14]  The circuit court

indicated from the bench that, using this value, it would have divided the funds equally – awarding

about $100,000 to both husband and wife.  The circuit court then apparently departed from that

method of valuation – finding that the "current value" of SunTrust account 5678 was $77,100.21 at

the time of its letter opinion to the parties in December 2012.  Thus, in its written divorce order, the

circuit court awarded wife the entire $77,100.21 "current value" of SunTrust account 5678.

However, the record does not adequately explain how the circuit court derived a "current

value" of $77,100.21 for SunTrust account 5678.  A review of the transcript of the February 19,

2013 hearing on the parties' motions for reconsideration shows that the attorneys for *both* parties

appeared to have been confused by this valuation.  Furthermore, husband's counsel supported his

written motion for reconsideration on this issue with bank statements showing the balances for

SunTrust account 5678 during the course of the divorce litigation.  These documents indicate that

SunTrust account 5678 last had a balance as high as $77,000 on the August 2012 statement, that the

account balance had dwindled to $5,000 on the December 2012 statement (at the time that the

circuit court issued its letter opinion), and that account 5678 actually had a negative balance on the

January 2013 statement.[15]  When husband's counsel referenced these account balances at the

February 19, 2013 hearing, the circuit court stated that it would not reconsider the issue because

there needed to be "finality in the litigation."  However, although the admission of evidence is

[14] Code § 20-107.3(A) states, in pertinent part, that the circuit court "shall determine" the value of the parties' property "as of the date of the evidentiary hearing on the evaluation issue." However, "[u]pon motion of either party made no less than 21 days before the evidentiary hearing the court may, for good cause shown, in order to attain the ends of justice, order that a different valuation date be used."  Id.  The circuit court here denied husband's motion to use an alternative valuation date that was later than the May 2012 equitable distribution hearing – although it ultimately awarded wife an amount that equaled what the circuit court found to be the "current value" of SunTrust account 5678 at the time of its December 14, 2012 letter opinion.

[15] We note that the circuit court never found that husband – unlike wife – committed waste of marital assets.  The record also does not appear to include any written order finding that husband actually violated the provisions of the *pendente lite* order.

- 16 -

within a trial judge's discretion, the circuit court's determination that the "current value" of SunTrust account 5678 was $77,100.21 was not supported by evidence in the record on appeal. See Code § 8.01-680.

Therefore, we hold that the circuit court committed reversible error regarding husband's second assignment of error. Accordingly, we reverse the circuit court's finding of a $77,100.21 "current value" for SunTrust account 5678 – and we remand the matter for reconsideration of that issue.

2. CLASSIFICATION OF THE MICHIGAN LAKE HOUSE (WIFE'S ASSIGNMENT OF ERROR 2)

In her second assignment of error, wife argues that the circuit court erred in finding that the "lake house" (or "cottage") in West Bloomfield, Michigan, was husband's separate property. "Because the trial court's classification of property is a finding of fact, that classification will not be reversed on appeal unless it is plainly wrong or without evidence to support it." Ranney v. Ranney, 45 Va. App. 17, 31-32, 608 S.E.2d 485, 492 (2005).

Code § 20-107.3(A) states, in pertinent part:

> Separate property is (i) all property, real and personal, acquired by either party before the marriage; (ii) all property acquired during the marriage by bequest, devise, descent, survivorship or gift from a source other than the other party; (iii) all property acquired during the marriage in exchange for or from the proceeds of sale of separate property, provided that such property acquired during the marriage is maintained as separate property; and (iv) that part of any property classified as separate pursuant to subdivision A 3.

Code § 20-107.3(A)(1); see also Code § 20-107.3(A)(3)(d) (addressing the commingling of separate and marital property and stating that, to the extent that contributed separate property "is retraceable by a preponderance of the evidence and was not a gift, such contributed property shall retain its original classification").

Viewing the evidence here in the light most favorable to husband (as we must, since he prevailed below on this issue), the circuit court did not err in finding that husband successfully

traced the Michigan lake house to husband's separate funds. This finding was not plainly wrong or without evidence to support it. See Code § 8.01-680.

The record establishes that husband purchased the lake house from his mother's estate, supplying the downpayment for that purchase using NationsBank account 1912 – which contained husband's separate funds. Mortgage payments for the lake house were then made using the same NationsBank account. Husband later transferred the funds in NationsBank account 1912 to Albemarle First Bank account 7282, opening that account solely in husband's name. Husband also opened another account, Albemarle First Bank account 2947, which was opened in both husband's and wife's name. While some payments for the lake house's mortgage came from Albemarle First Bank account 2947, husband provided evidence at trial that those payments were actually funds that were transferred from Albemarle First Bank account 7282 – which contained only husband's separate funds. Therefore, husband established that the source for the lake house's mortgage payments remained husband's separate funds. Furthermore, the circuit court acting as factfinder was entitled to accept husband's testimony that wife was only listed on the mortgage in order to establish more credit for wife.

Accordingly, we affirm the circuit court's decision to classify the lake house as solely husband's separate property.

### 3. THE MICHIGAN FARM
#### (HUSBAND'S ASSIGNMENT OF ERROR 3; WIFE'S ASSIGNMENT OF ERROR 3)

Husband's third assignment of error and wife's third assignment of error both concern what the parties and the circuit court have called "the farm," which is located in Merritt, Michigan. The record establishes that husband's parents had owned the farm. Upon the death of husband's mother, his last surviving parent, husband inherited a one-quarter interest in the farm. Husband's three siblings also inherited one-quarter interests each. During the marriage, husband purchased the remaining three-quarters interest in the farm from his siblings. In its December 14, 2012 letter

opinion, the circuit court found that husband successfully traced this purchase to his own separate

funds[16] – but that he purchased the remaining three-quarters interest in the farm with the intent to

give it as a gift to the marital estate.

The circuit court explained in the letter opinion:

> It is Mr. Delanoy's position that a ¾ interest was acquired by
> Mr. Delanoy from his INHDSE Account #1912. The Court agrees
> but finds from the evidence Ms. Delanoy met her burden to show
> Mr. Delanoy intended to make a gift of the property to her. It was
> treated by the parties as a vacation home for the both of them as
> husband and wife as detailed by Mr. Franzen in his brief. Therefore
> the Court finds the property is 25% separate property and 75%
> marital property. The value of this asset is $94,400.

The circuit court then confirmed this finding in its July 17, 2013 order of divorce, ruling, "The

marital equity of the property is $70,800, and the property is allocated to husband, with an offset of

$35,400 to wife."

### a. Donative Intent (Husband's Assignment of Error 3)

On appeal, husband challenges the circuit court's finding that husband "intended to make a

gift of the [farm] property to her." The Supreme Court has explained, "The burden of proof that the

transfer was a gift is upon the party seeking to establish the gift." Utsch v. Utsch, 266 Va. 124, 128,

581 S.E.2d 507, 508 (2003).

> [T]o establish the existence of a gift, wife was required to prove, by
> clear and convincing evidence, the following three elements: (1) the
> intention on the part of the donor to make the gift; (2) delivery or
> transfer of the gift; and (3) acceptance of the gift by the donee. Here,
> husband argues that wife failed to prove the first element,
> specifically, his donative intent and the nature and extent of that
> intent.

Robinson v. Robinson, 46 Va. App. 652, 665, 621 S.E.2d 147, 154 (2005) (internal quotation marks

and citation omitted). Although "intent is a question to be determined by the fact finder," Cirrito v.

---

[16] Wife has not assigned error to this finding.

Cirrito, 44 Va. App. 287, 305, 605 S.E.2d 268, 276 (2004), the circuit court here was plainly wrong in finding clear and convincing evidence of husband's donative intent. See Code § 8.01-680.

In support of its finding that husband intended to make a gift of the Michigan farm, the circuit court relied on evidence indicating that the parties treated it "as a vacation home" during the marriage. However, donative intent must be supported by a more convincing offer of proof. See Theismann v. Theismann, 22 Va. App. 557, 566, 471 S.E.2d 809, 813 (affirming a finding of donative intent where the husband sent the wife cards indicating that a farm "was 'our home'" and that "money was hers to spend"), aff'd on reh'g en banc, 23 Va. App. 697, 479 S.E.2d 534 (1996); see also Watts v. Watts, 40 Va. App. 685, 702, 581 S.E.2d 224, 233 (2003) (reversing the trial court's finding that the disputed items were the wife's separate property when she testified that using her inheritance money to buy the items "'was something [nice she] wanted to do' for her family" and that she "considered the items to be 'gifts for us'"); Rowe v. Rowe, 24 Va. App. 123, 137, 480 S.E.2d 760, 766 (1997) (affirming a finding of donative intent where "wife testified that husband had said to her that his property was also her property"). The record here is simply insufficient to prove husband's donative intent by clear and convincing evidence.

The mere fact that husband – quite reasonably and understandably – permitted property that had been owned by his parents to be enjoyed by his own family does not somehow prove that husband actually intended to relinquish his separate interest in this property. Furthermore, we observe that the circuit court found that husband's donative intent applied *only* to the three-quarters interest in the farm that husband purchased with his own separate funds. The circuit court did *not* find that husband intended to give a gift of the one-quarter interest in the farm that he had inherited from his mother – and did not include the value of that remaining one-quarter interest among the marital funds that were subject to equitable distribution. The record does not support the circuit court's conclusion that husband simultaneously intended to retain his preexisting one-quarter

- 20 -

interest in the farm as his separate property – while also intending to relinquish his separate three-quarters interest (which husband purchased with his own separate funds) by way of a gift.[17] Viewing the evidence in the light most favorable to wife (as we must since she prevailed below on this issue), the record simply does not establish clear and convincing evidence of the required donative intent on husband's part. See Utsch, 266 Va. at 128, 581 S.E.2d at 508.

Accordingly, we hold that wife failed to show that any portion of the Michigan farm property was marital property that was subject to equitable distribution.

### b. Value of the Michigan Farm (Wife's Assignment of Error 3)

In her third assignment of error, wife challenges the circuit court's finding that the value of the Michigan farm property was $94,400 at the time of the equitable distribution proceeding. She argues that the circuit court instead should have accepted her claim that the fair market value of the property was $170,000 (based on the results of an appraisal that wife had ordered, as well as wife's own research of what she claimed were comparable properties). Wife contends that she was entitled to an award of $63,750 for her share of the marital equity of this property.[18]

We have already held *supra* that the Michigan farm is entirely husband's separate property – and, therefore, we hold that it is not subject to equitable distribution under Code § 20-107.3. To the extent that determining the value of the Michigan farm might still have relevance to the circuit court's consideration of the issues on remand, we find no error in the circuit court's decision to

_____

[17] Although the three-quarters interest that was purchased from husband's siblings was retitled in husband's and wife's names, Code § 20-107.3(A)(3)(h) states that "[n]o presumption of gift shall arise" where "newly acquired property is conveyed into joint ownership." Furthermore, wife testified that this portion of the property was jointly titled simply because husband "told me that the assessor wouldn't allow him to just put his own name on there."

[18] Based on her argument that the fair market value of the Michigan farm was $170,000, wife contends that the marital equity in that property would be $127,500 (representing 75% of the $170,000 value). Since the circuit court generally divided the marital assets equally, wife claims that she should have been awarded half of that $127,500 value – or $63,750 – during equitable distribution of the Michigan farm.

value the Michigan farm at $94,400. The circuit court was entitled to rely on evidence that the property had an assessed value of $94,400, and an assessed value is one method of determining the value of property. See McDavid v. McDavid, 19 Va. App. 406, 413, 451 S.E.2d 713, 718 (1994) (holding that a trial court may "choose among conflicting assessments of value as long as its finding is supported by the evidence"); see also Code § 58.1-3280 (connecting assessed value with fair market value).

### 4. WASTE OF MARITAL ASSETS
#### (HUSBAND'S ASSIGNMENT OF ERROR 5; WIFE'S ASSIGNMENT OF ERROR 4)

Both parties challenge the circuit court's finding that wife wasted $74,480 in marital assets from SunTrust account 7053 during the course of the divorce litigation. Wife argues that the circuit court overstated the amount of wasted marital funds, which wife claims was at most $18,979.51. Husband argues that the circuit court vastly understated the amount of wasted marital funds, contending that the circuit court should have found that wife wasted all of the $300,000 in martial funds that she spent from SunTrust account 7053.

"Waste" is characterized as the "dissipation of marital funds in anticipation of divorce or separation for a purpose unrelated to the marriage and in derogation of the marital relationship at a time when the marriage is in jeopardy." Booth v. Booth, 7 Va. App. 22, 27, 371 S.E.2d 569, 572 (1988). "Once the aggrieved spouse shows that marital funds were either withdrawn or used after the breakdown, the burden rests with the party charged with dissipation to prove that the money was spent for a proper purpose." Clements v. Clements, 10 Va. App. 580, 586, 397 S.E.2d 257, 261 (1990). Use of funds for living expenses while the parties are separated does not constitute waste. Id. at 587, 397 S.E.2d at 261.

Here, in response to husband's allegation that she wasted the $300,000 in marital funds that she had transferred to SunTrust account 7053, wife presented at trial a binder of documents reflecting the use of those funds. These documents, which encompass almost 600 pages, take up an

- 22 -

entire volume of the joint appendix on appeal. Assessing this evidence, the circuit court found in its

December 14, 2012 letter opinion:

> [Husband] alleges that [wife] has wasted almost the entirety of the $300,000 but [wife] argued that these funds have been used for martial purposes, including litigation expenses, healthcare expenses, court ordered babysitters and other household expenses and therefore the funds should be valued as [of] the date of the hearing. The Court would note that Mr. Delanoy spent appropriately $124,000.00, including attorneys fees during the same period of time which is considerabl[y] less than Ms. Delanoy, who the Court recognizes did take care of the two girls. The Court also finds th[at] part of the reason for the wife having higher attorneys fees is because Ms. Delanoy was very unfamiliar with their financial resources and since tracing was an issue in this case, it required more time of her attorney. However, some of those expenditures by the wife were excessive to the point of being waste and the amount is $74,480.00.

The circuit court's finding that wife dissipated $74,480 in marital assets will be affirmed because it

was not plainly wrong or unsupported by the evidence. See Code § 8.01-680.

The record establishes that wife depleted the $300,000 in SunTrust account 7053 despite

earning a full-time salary and residing in the marital home – and she was not responsible for paying

that home's mortgage, taxes, or utility bills under the terms of the *pendente lite* order. Wife argues

that the circuit court disregarded that the *pendente lite* order did not award her *pendente lite* child

support, but the circuit court expressly stated in the letter opinion that wife "did take care of the two

girls." Furthermore, wife was not responsible for paying the children's medical, dental, and

counseling costs under the terms of the *pendente lite* order. Given these circumstances, we will not

disturb the circuit court's conclusion that wife wasted $74,480 of the $300,000 in marital funds

spent from SunTrust account 7053.

However, we also disagree with husband's argument that wife failed to bear the burden of

establishing that *any* of the $300,000 in funds from SunTrust account 7053 were used for a proper

purpose. See Clements, 10 Va. App. at 586, 397 S.E.2d at 261. Clearly, the record supports the

circuit court's conclusion that at least *some* of these funds were spent for proper purposes.

- 23 -

Moreover, husband's brief does not adequately address what *specific* expenses the circuit court should have found wasteful – in addition to the $74,480 in marital funds for which the circuit court has already held wife responsible for having wasted. "The appellate court is not a depository in which the appellant may dump the burden of argument and research." Fadness v. Fadness, 52 Va. App. 833, 850, 667 S.E.2d 857, 865 (2008) (internal quotation marks and citation omitted). Accordingly, we affirm the circuit court's finding with respect to wife's waste of marital funds.

### 5. TRACING OF SUNTRUST ACCOUNTS 7053 AND 0532
### (HUSBAND'S ASSIGNMENT OF ERROR 4; WIFE'S ASSIGNMENT OF ERROR 5)

In his fourth assignment of error, husband argues that the $300,000 that wife transferred from SunTrust account 4959 and used to open SunTrust account 7053 in her name was actually husband's separate property that derived from two sales of Klockner Pentaplast stock. Wife's fifth assignment of error touches on a related issue. She challenges the circuit court's determination that the funds in husband's SunTrust account 0532 – which were also transferred from SunTrust account 4959 – were husband's separate property.

As discussed *supra*, SunTrust account 4959 held approximately $1,000,000 in funds that originated with the sale of stock in Klockner Pentaplast. The record establishes that husband purchased Klockner Pentaplast stock on two different occasions during the marriage – in 2003 and again in 2006 – making both transactions presumptively marital. See Code § 20-107.3(A)(2). However, it appears from the record that the 2006 stock purchase was actually made using husband's separate funds – as he presented documents and bank statements tracing the purchase of that stock to his separate funds held in his own separate bank accounts. Thus, husband satisfied the burden of showing that $205,720.78 in proceeds received from the sale of the Klockner stock purchased in 2006 was his separate property.[19]

---

[19] Husband asserts on brief that the Klockner Pentaplast stock that was purchased in 2003 was also purchased using his separate funds. However, husband's own trial testimony seems to

Therefore, when wife transferred $300,000 from SunTrust account 4959 (an account funded by the proceeds of the sale of Klockner Pentaplast stock) to SunTrust account 7053, that transfer diminished the balance of an account that contained, in part, husband's separate funds. It does not appear from the circuit court's December 14, 2012 letter opinion whether the circuit court addressed if any of the $300,000 that wife transferred to SunTrust account 7053 was traceable to husband's separate funds from the sale of the Klockner Pentaplast stock that was purchased in 2006. Accordingly, we reverse the circuit court's finding that the funds in wife's SunTrust account 7053 were entirely marital – and we remand the matter for the circuit court to conduct a retracing analysis on that issue.

Similarly, we reverse the circuit court's finding that husband's SunTrust account 0532 contained only husband's separate property. The record establishes that husband transferred about $687,000 from SunTrust account 4959 (the account funded by the proceeds of the sale of Klockner Pentaplast stock) to his SunTrust account 0532. While SunTrust account 4959 contained funds that derived from the sale of the Klockner Pentaplast stock that was purchased in 2006 (which husband has shown was purchased with his separate funds), SunTrust account 4959 also contained funds that derived from the sale of the Klockner Pentaplast stock that was purchased in 2003 (which husband has not shown was purchased with his separate funds). Accordingly, as noted, we remand the matter to the circuit court for a retracing analysis to determine whether SunTrust account 0532 contained marital funds.

---

contradict this assertion. Husband testified that, when those shares were purchased in 2003, he "financed it" through Regents Bank. Furthermore, the joint appendix apparently does not contain any documentation showing the nature of this transaction with Regents Bank – and husband has not identified whether (and, if so, where) such documentation can be found in the voluminous record on appeal.

6. UNION BANK ACCOUNTS (WIFE'S ASSIGNMENTS OF ERROR 6 THROUGH 8)

*a. Union First Market Bank Account 3301*

In her sixth assignment of error, wife argues that the circuit court erred in classifying Union First Market Bank account 3301 as entirely husband's separate property. Wife contends that the funds in that account were at least partly marital. In support of this argument, wife argues that Union account 3301 was funded by the sale of shares in Checker Drugs (some of which were purchased during the marriage) and from the liquidation of shares in Pharmacy Services, Ltd. (shares that wife claims husband did not inherit from his mother's estate). Husband responds on brief that he provided extensive documentation showing that all shares in Checker Drugs were purchased with separate funds and that husband and his siblings did, in fact, inherit shares of Pharmacy Services, Ltd., upon the death of their mother.

In resolving this issue, the circuit court found in its December 14, 2012 letter opinion:

> The Court finds the Union First Market Bank account #3301 was properly traced back[] either to proceeds Mr. Delanoy received from Checkered Drugs including its subsequent sale or proceeds he received from Pharmacy Services including its dissolution. The Court does not find that any of the monies in the inheritance or drug store accounts were payroll or marital funds.

Based on our review of the record, we agree with the circuit court that husband successfully traced the monies held in Union account 3301 to his separate funds. Accordingly, we will affirm the circuit court's finding here because it was supported by evidence in the record on appeal. See Code § 8.01-680.

*b. Union Bank & Trust Account 8512 and Union First Market Bank Account 4006*

In her seventh assignment of error, wife challenges the circuit court's decision to classify Union Bank & Trust account 8512 as entirely husband's separate property. In her eighth assignment of error, wife also challenges the circuit court's decision to classify Union First Market

Bank account 4006 as entirely husband's separate property. Since Union account 4006 was funded by monies from Union account 8512, these assignments of error will be considered together.

The record establishes that Union account 8512 was titled in husband's name with the description "Farm Account." Union account 8512 was established during the marriage (as was Union account 4006), making the account presumptively marital. See Code § 20-107.3(A)(2). Husband argues that the funds in Union account 8512 are his separate property because those funds are used for expenditures relating to the Michigan farm – which husband claims is his separate property. We agree with husband's argument that the Michigan farm is his separate property, as we have discussed *supra*. However, it does not necessarily follow that Union account 8512 also is husband's separate property.

Husband presented testimony and argument in the circuit court that the bulk of the funds in Union account 8512 came from insurance proceeds that were received after raccoons caused significant damage to the Michigan farm house. Husband does not cite any portion of the joint appendix or the record that establishes when the insurance policy was established, whether the names of both parties or only husband's name is listed on the insurance policy, and what account paid for the premiums on this insurance policy. Without such information about the nature of the insurance policy the proceeds from which have funded Union account 8512, husband cannot rebut the presumption that the funds in Union account 8512 (or Union account 4006) are marital property. In addition, husband appears to indicate that some funds in this account established during the marriage came from other sources besides the insurance proceeds, but he does not establish whether these funds were separate property or marital property. Therefore, we reverse the circuit court with respect to wife's seventh and eighth assignments of error – and we remand the matter to the circuit court for a retracing analysis to determine the classification of Union account 8512 and Union account 4006.

In his seventh, eighth, and ninth assignments of error, husband argues that the circuit court abused its discretion when it awarded wife a $300,000 lump sum spousal support award.[20] The circuit court explained its reasons for granting wife this lump sum spousal support award in the December 14, 2012 letter opinion, stating:

> The Court will grant Ms. Delanoy's motion for a lump sum in the amount of $300,000.00 to be paid within 60 days. The Court finds she will need the money to buy a home and this award is consistent with how the parties lived. While they did have a modest lifestyle, they did have funds in reserve and Ms. Delanoy does have a need for such a reserve now.

Furthermore, the circuit court also commented on the lump sum spousal support from the bench at the post-trial hearing held on February 19, 2013, stating:

> [Wife] does need retirement monies, and I think there should be a certain amount of retirement funds that she has, that she has under control. If I give them to her on a monthly basis, then she will not have the time in which to potentially invest those funds to make them grow over the next 20, 30, 40 years, so I think that's a consideration.

We need not and do not address at this time whether the circuit court actually abused its discretion when it awarded wife a $300,000 lump sum spousal support award. "[W]here an equitable distribution award is reversed on appeal and 'the provisions with regard to the marital property are to be considered on remand, the court must necessarily re-examine spousal support in the light of whatever new or different considerations flow from the additional proceedings.'"

---

[20] Husband's seventh assignment of error alleges that the circuit court did not identify special circumstances or compelling reasons for such a large lump sum spousal support award. Husband's eighth assignment of error alleges, *inter alia*, that the circuit court "us[ed] spousal support to address an equitable distribution matter" and failed to find whether husband could satisfy the $300,000 lump sum spousal support award. Husband's ninth assignment of error alleges that the circuit court erred in weighing the Code § 20-107.1(E) spousal support factors. These arguments are different than the argument that husband raised in his sixth assignment of error (addressed *supra*) – in which husband asserted that wife should be completely barred from receiving any spousal support at all.

Robinson v. Robinson, 46 Va. App. 652, 671, 621 S.E.2d 147, 156-57 (2005) (*en banc*) (quoting McGinnis v. McGinnis, 1 Va. App. 272, 277, 338 S.E.2d 159, 161 (1985)). "Accordingly, because we reverse the equitable distribution award and remand for reconsideration, we further direct the trial court, on remand, to reconsider the issue of spousal support." Id. at 671, 621 S.E.2d at 157.

On remand, the circuit court is directed to address whether adequate special circumstances or compelling reasons still exist for a lump sum spousal support award – given the circumstances before it on remand.[21] See Kaufman v. Kaufman, 12 Va. App. 1200, 1206, 409 S.E.2d 1, 4 (1991); see also Blank v. Blank, 10 Va. App. 1, 4, 389 S.E.2d 723, 724 (1990). Furthermore, we note that, under Code § 20-107.1(C), spousal support payments may be ordered to "be made in periodic payments for a defined duration, or in periodic payments for an undefined duration, or in a lump sum award, or in any combination thereof."

III. CONCLUSION

For the reasons explained above, we affirm the circuit court with respect to husband's first, fifth, and sixth assignments of error – and reverse the circuit court with respect to husband's second, third, and fourth assignments of error. We affirm the circuit court with respect to wife's first, second, third, fourth, and sixth assignments of error – and reverse the circuit court with respect to wife's fifth, seventh, and eighth assignments of error. On remand, the circuit court is directed to classify the Michigan farm as solely husband's separate property. In addition, the circuit court is directed to reconsider its valuation or classification rulings with respect to SunTrust account 5678,

---

[21] We note that, following the entry of the circuit court's December 14, 2012 letter opinion and the February 19, 2013 hearing on the parties' motions for reconsideration, the circuit court entered a written order directing wife to vacate the marital residence and directing husband to pay wife over $100,000 to represent half of the marital equity in that residence. It appears undisputed that wife has since purchased her own home. In addition, the circuit court's July 17, 2013 order of divorce entitled wife to $147,240.89 of the marital share of husband's retirement account with Klockner Pentaplast and directed husband's attorney to prepare a qualified domestic relations order to that effect.

SunTrust account 7053, SunTrust account 0532, Union account 8512, and Union account 4006. We do not address husband's seventh, eighth, and ninth assignments of error challenging the $300,000 lump sum spousal support award to wife because remanding the matter for new equitable distribution determinations also requires the circuit court to reconsider spousal support. On remand, the circuit court should consider if there are still special circumstances or compelling reasons justifying such a large lump sum spousal support award, based on the circumstances before the circuit court on remand.[22]

Affirmed in part,
reversed in part and remanded.

---

[22] Both parties seek from this Court an award of appellate attorneys' fees and costs. See O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996). We hold that neither party is entitled to such an award under the circumstances of this case.

Coleman, J., concurring, in part, and dissenting, in part.

I concur and join in the majority opinion except I respectfully dissent from the holding in Part 3 (The Michigan Farm), in which the majority reverses the trial court. The majority concludes that the evidence was insufficient to support the trial judge's finding that the husband intended to give his wife an undivided interest in The Michigan Farm. In my view, the very fact that the husband had the deed made to himself and his wife as joint tenants is sufficient to have supported the trial judge's (who was acting as factfinder) determination that he intended his wife own the property jointly. While legal title does not control the equitable distribution of real estate, in my view, an appellate court should not overturn a trial judge's factual finding that executing and recording a deed to an undivided interest in real estate was sufficient, under these circumstances, to prove donative intent. I would uphold the trial judge's factual finding of donative intent. Accordingly, I respectfully dissent.